James Patrick HAMILTON, et. al., Plaintiffs,

v.

AIG LIFE INSURANCE COMPANY, Defendant.

No. CIV.A.00–01132 HHK.

United States District Court, District of Columbia.

Jan. 15, 2002.

Richard Alan Seligman, Washington, DC, for plaintiffs.

Waldemar Jacob Pflepsen, Jr., Richard Karpinski, Raul Antonio Cuervo, Jorden Burt Boros Cicchetti Berenson & Johnson, L.L.P., Washington, DC, for defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs James Patrick Hamilton, Jill McLaughlin and Robin McLaughlin claim that defendant AIG Life Insurance Company ("AIG") violated the Employee Retirement Income and Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, by refusing to pay them benefits they claim they are due as beneficiaries under an insurance plan that covered the life of Bruce McLaughlin. AIG moves for summary judgment on the grounds that no benefits are owed because McLaughlin's death resulted from an "intentionally self-inflicted injury," a manner of death excluded from the insurance plan's coverage. Upon consideration of AIG's motion, the opposition thereto, and the record of this case, the court concludes that the motion should be granted.

### I. BACKGROUND

On October 19, 1997, Bruce McLaughlin was found dead by his partner, James Hamilton, upon Hamilton's return to their Washington, D.C. residence from a business trip. McLaughlin was discovered with a bondage collar around his neck that

was attached to a clothesline threaded through two bolts on opposite walls. McLaughlin was found naked, except for a pair of wool socks, and was kneeling in front of mirrors with a pair of combat boots in front of him. An autopsy concluded that the cause of death was asphyxiation and that the death was accidental.

At the time he died, Bruce McLaughlin was an employee of Cisco Systems, Inc. ("Cisco") and was a participant in Cisco's Accidental Death & Dismemberment ("AD & D") life insurance plan. The plan provides benefits for members who die as a result of injuries suffered while covered by the plan, but excludes coverage for death caused by, or resulting from, "suicide or any attempt at suicide or intentionally self-inflicted injury or any attempt at self-inflicted injury." Def. Mot. for Summ. J., Zimmerman Aff., Ex. B, at 7. AIG, the author of Cisco's life insurance plan, is also the plan's administrator.

McLaughlin named plaintiffs, his partner Hamilton and his siblings Jill and Robert McLaughlin, as the policy's beneficiaries.[1] Soon after McLaughlin's death, plaintiffs filed a claim with AIG for death benefits. As part of its claim investigation, AIG obtained a police report of McLaughlin's death, an autopsy report, and McLaughlin's death certificate. Based on these reports, AIG believed that McLaughlin's death resulted from autoerotic asphyxiation, an act where one seeks to enhance sexual stimulation by restricting the flow of oxygen to the brain. AIG determined that when McLaughlin set up his apparatus, he tied his ropes too tight, causing him to accidentally choke himself to death while engaging in his act of sexual gratification. As a result, the insurance

company concluded that McLaughlin was not covered because his death resulted from the "intentionally self-inflicted injury" of autoerotic asphyxiation.

AIG did not deny the claim immediately, however, but requested advice from Robert Morris of the law firm of Epstein, Becker & Green as to whether the law allowed insurance companies with "intentionally self-inflicted injury" exclusions to deny a claim arising out of a death by autoerotic asphyxiation. In his review of the matter, Morris stated that the law was limited and unclear, but provided some basis for denying plaintiffs' claim. On March 3, 1998, based on the police report of McLaughlin's death, the autopsy report, the death certificate, and the outside legal opinion it obtained, AIG denied plaintiffs' claim on the ground that it was excluded by the "intentionally self-inflicted injury" provision of Cisco's life insurance plan.

Plaintiffs appealed the denial through AIG's internal review procedures, claiming that McLaughlin's death was not the result of an intentionally self-inflicted injury. In support of their appeal, plaintiffs submitted an affidavit from Dr. Michael G. Gelles, a psychologist who claimed extensive experience in reviewing and investigating autoerotic fatalities. Gelles suggested that McLaughlin did not intend to cut off the flow of oxygen to his brain but rather had created a bondage-style setting that was part of a staged fetishistic masturbation scene. In other words, McLaughlin's sexual stimulation derived from the visual pleasure of seeing himself in bondage attire and not from any self-induced hypoxia.[2]

AIG responded to the appeal by seeking the opinion of an independent forensic psy-

---

1. The policy provided death benefits at four times McLaughlin's annual salary, or $453,660.

2. Hypoxia results when there is a deficiency of oxygen reaching the brain. Merriam–Webster's Collegiate Dictionary 572 (10th ed.1999).

chologist, Dr. James Lewis. Dr. Lewis evaluated the information upon which AIG based its initial denial as well as Dr. Gelles's report and concluded that the cause of death was autoerotic asphyxiation and that the act resulting in death was intentional. AIG also sought another review from Morris asking if Dr. Gelles's report affected the merits of plaintiffs' claim. Morris stated that the report did not change his legal analysis regarding autoerotic asphyxiation, but noted that Dr. Gelles's conclusions, if true, improved plaintiffs' chances of succeeding in court.

Based on the opinions of Dr. Lewis and Frank Morris, AIG denied plaintiffs' appeal. This suit followed.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law. Facts "that might affect the outcome of the suit under the governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-movant's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant's evidence must be of a nature "that would permit a reasonable jury to find" in its favor. *Laningham v. Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). Evi-

dence that is "merely colorable" or "not significantly probative," is not sufficient to sustain a grant of summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. ANALYSIS

### A. Standard of Review

#### 1. *Abuse of Discretion vs. De Novo*

 In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court established that claims brought under ERISA challenging the denial of insurance benefits are "to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan" in which case review is for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). A plan administrator's decision is not an abuse of discretion if it is reasonable. *See Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1454 (D.C.Cir.1992) ("The essential inquiry here, in short, is what the district court understood it to be: Did the [plan administrator] reasonably construe and apply [the company's] plan in [plaintiff's] case?"). Neither side disputes that Cisco's AD & D plan confers discretion on AIG in determining eligibility.

 In deciding whether an abuse of discretion occurred, courts will account for a conflict of interest on the part of an insurance company. In *Firestone*, the Supreme Court cautioned that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (citing Restatement (Second) of Trusts, § 187, Comment *d* (1959)).[3] Because ad-

---

**3.** The circuits have developed several methods for applying the standard of review when

there is a conflict of interest. The most popular approach employs a "sliding scale," where

ministrators of insurance plans are considered fiduciaries under ERISA, they must act in the best interests of their policyholders. But insurance companies that pay benefits out of their own pockets also have an incentive to deny policyholders' claims, thus creating a potential conflict of interest. *See Fitts v. Federal Nat'l Mortgage Ass'n*, 77 F.Supp.2d 9, 20 (D.D.C.1999), *rev'd on other grounds*, 236 F.3d 1 (D.C.Cir.2001). Because AIG is a plan fiduciary that also stands to save money through a claim denial, it acts under a potential conflict of interest. While recognizing the presence of a potential conflict, in obeisance to *Firestone*, the court reviews AIG's decision for abuse of discretion.

### 2. The Appropriate Level of Deference Within Abuse of Discretion Review Standard

■ Plaintiffs posit that this court should dramatically decrease the amount of deference shown AIG in determining whether AIG abused its discretion because its decision was tainted by its conflict of interest. Plaintiffs make two arguments in support of their position. First, plaintiffs contend that AIG's policy of consistently denying autoerotic asphyxiation claims demonstrates self-interest because it shows that AIG was committed to denying

plaintiffs' claim regardless of its merits. Second, plaintiffs maintain that AIG's reversal of the initial recommendation that their claim be paid shows that AIG's decision was actuated by its conflicting interest. Plaintiffs point out that soon after AIG received their claim, Jill Vivian, one of the company's claims examiners, recommended that it be paid. Philip Harbottle, director of AIG's claims department, disagreed with Vivian's recommendation and recommended denial of the claim. Plaintiffs contend that AIG's change of course demonstrates that Harbottle wanted to deny plaintiffs' claim, regardless of its merits. Plaintiffs arguments are unconvincing.

Although AIG may have a financial incentive to deny claims brought by its fiduciaries, the court rejects the notion that the consistent application of a contract provision is evidence of an actual conflict of interest. It is apparent that AIG has a consistent policy of denying claims arising from deaths resulting from autoerotic asphyxiation because it believes that the "intentionally self-inflicted injury" provision of its plan bars payment for such claims. Indeed, plaintiffs themselves allege that the "intentionally self-inflicted injury" language of AIG's plan was inserted after AIG learned that it could no longer deny autoerotic asphyxiation claims on the basis

---

the level of deference shown to the insurance company decreases in proportion to the evidence of a conflict. *See, e.g., Pinto v. Reliance Std. Life Ins. Co.,* 214 F.3d 377, 392 (3d Cir.2000) (adopting the sliding scale approach and listing other circuits following that approach). Other circuits adhere to the burden-shifting, or "presumptively void" approach in which the plan administrator's decision is presumed to be arbitrary and capricious unless the administrator can show that either (1) under *de novo* review, the administrator's decision was correct, or (2) that the conflict of interest did not affect the administrator's decision. *See, e.g., Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1566–67 (11th Cir.

1990). Finally, other circuits refuse to apply any form of heightened review in the absence of evidence of an actual conflict of interest. However, once the plaintiff establishes that an actual conflict influenced the administrator's decision, those courts will review the decision *de novo. See, e.g., Sullivan v. LTV Aerospace and Def. Co.,* 82 F.3d 1251, 1255–56 (2d Cir. 1996); *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1322–23 (9th Cir.1995). Significantly, under each of the above standards, no court will reverse a plan administrator's decision without some evidence that self-interested behavior affected the administrator's decision. The D.C. Circuit has not yet addressed the issue.

that this cause of death was not accidental. If language is added so as to exclude certain claims, then a consistent policy of denial based on that contract language is properly characterized as adherence to the contracts' terms rather than as self-dealing behavior. *See Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1568 (11th Cir.1990) (noting that "uniformity of construction" and the "internal consistency of a plan under the fiduciary's interpretation" are evidence that the plan administrator's decision was not an abuse of discretion).[4]

Additionally, if AIG were committed to uniformly denying all autoerotic fatality claims, then it would not have any reason to seek outside legal opinion on the validity of denying such claims. Not only did AIG seek outside legal opinion before initially denying plaintiffs' claim, it did so again during plaintiffs' appeal in order to determine if Dr. Gelles' report removed any basis for denial. AIG also sought the opinion of an independent forensic expert in order to evaluate the validity of Dr. Gelles' claims. Relying on opinions of independent experts who have no financial interest in the outcome of the claim indicates that self-interested motives did not dictate AIG's actions. *See Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir.1998) (finding that reliance on outside experts is evidence of good-faith behavior by a conflicted insurance company). Thus, AIG's uniform interpretation of "intentionally self-inflicted injury" to exclude autoerotic asphyxiation fatalities only demonstrates that AIG interpreted and applied

its insurance policies consistently and not that the company had predetermined that all autoerotic claims would be denied.

Plaintiffs' argument regarding AIG's alleged change of course is likewise unconvincing. To be sure, inconsistent treatment of the same facts by an insurance company can demonstrate a conflict of interest by suggesting that the company committed itself to denying benefits in the face of facts suggesting that they should be granted. *See, e.g., Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir.2000) (giving less deference to an insurer's decision when the insurer "reversed its own initial determination that [the plaintiff] was totally disabled without receiving any additional medical information."); *Brown*, 898 F.2d at 1569 ("That [the insurance company] would reach opposing conclusions on the basis of the same evidence seriously challenges the assumptions upon which deference is accorded to [the insurance company's] interpretation of the plan."). Here, however, AIG did not consider the same set of facts in an inconsistent fashion. When Vivian recommended on December 19, 1997 that plaintiffs' claim be paid, AIG's investigation was still ongoing. AIG had not yet received its outside legal opinion from Epstein, Becker & Green. It is not self-dealing behavior for an insurance company to change its mind on the basis of new information. *Cf. Block*, 952 F.2d at 1455 (holding that changing a decision based on new information does not demonstrate inconsistency).[5]

---

4. The consistency of AIG's contract construction is undisputed. After 1995, AIG consistently denied autoerotic asphyxiation death claims when policies contained an "intentionally self-inflicted injury" exclusion, but granted claims under policies that did not have the exclusion.

5. The present case is distinguishable from the cases cited by plaintiffs because there is a significant difference between an internal disagreement among employees over the merits of a claim prior to any final claims decision-the case here-and an insurance company's decision to reverse its previous final decision to award benefits, which is what happened in the cases cited by plaintiff.

With no evidence that any conflict of interest influenced AIG's decision, the court will not alter the level of deference given to AIG's determination. *See Fitts,* 77 F.Supp.2d at 20 n. 6 ("The potential conflict of interest, however, does not call for abrogation of the arbitrary and capricious standard, where, as here, the challenged decision would have been reasonable if made by a decision maker with no conflict of interest."). Consequently, if AIG's decision denying plaintiffs' claim was reasonable, there is no basis to overturn it.

## B. AIG's Decision not to Grant Benefits

AIG's position that McLaughlin's insurance policy does not cover his death because of the policy's exclusion for death resulting from an "intentionally self-inflicted injury" presents two issues which this court must evaluate: (1) whether AIG abused its discretion in deciding that McLaughlin intended to restrict the flow of oxygen to his brain, and (2) whether AIG abused its discretion in determining that restricting the flow of oxygen to the brain-partial strangulation-is an injury. Each issue is addressed in turn.

### 1. *Intent To Restrict Oxygen Flow to the Brain*

AIG, of course, argues that its determination that McLaughlin died as a result of autoerotic asphyxiation gone awry is reasonable and should be upheld. Plaintiffs proffer the theory that McLaughlin did not intend to choke himself but instead was simply enjoying a visually stimulating bondage scene. According to plaintiffs, AIG abused its discretion by summarily determining that the cause of death was autoerotic asphyxiation without conducting a more thorough investigation that would have revealed that McLaughlin did not intend to choke himself. Plaintiffs maintain that AIG violated its duty to investigate by not interviewing McLaughlin's partner, James Hamilton, who plaintiffs allege would have told AIG that McLaughlin did not intend to choke himself, and the police officers who investigated his death. Additionally, plaintiffs argue that AIG abused its discretion by arbitrarily dismissing the value of Dr. Gelles's report.[6] These arguments lack merit.

Several circuits have held that ERISA imposes a duty on insurance companies acting under a conflict of interest to conduct a good faith, reasonable investigation into the validity of the beneficiary's claim. *See Hightshue v. AIG Life Ins. Co.,* 135 F.3d at 1148; *Brown,* 898 F.2d at 1566 n. 11. *But see Pinto,* 214 F.3d at 394 n. 8 ("Our focus on process should not be read to require an additional duty to conduct a good faith, reasonable investigation. That is, we are not holding that [the insurance company] had a duty to gather more information, merely that the decision might have been arbitrary and capricious given the information available."); *Vega v. National Life Ins. Servs., Inc.,* 188 F.3d 287, 298 (5th Cir.1999) ("There is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to the claimant.").

---

6. Plaintiffs also argue that AIG's policy of uniform denial was an abuse of discretion. That argument was addressed in Subsection III.A.2 of this memorandum. Plaintiffs make an additional argument that AIG abused its discretion by selectively relying on only the portions of the Epstein Becker & Green reports that supported their position while ignoring the rest of the report. This is not the case. The reports indicate that there is law supporting both plaintiffs' and defendant's position. The authority to choose among reasonable alternatives is the essence of discretion, and thus AIG did not abuse its discretion in exercising that authority.

"Seeking independent expert advice is evidence of a thorough investigation," however, and as long as "the expert's advice is reasonably justified under the circumstances, the fiduciary's decision will be respected, despite the conflict of interest." *Hightshue*, 135 F.3d at 1148.

■ This court holds that AIG conducted a sufficiently thorough investigation to justify its decision to deny benefits to McLaughlin's beneficiaries. All the information AIG had when making its decision was compatible with a finding of death by autoerotic asphyxiation. Both the death certificate and the autopsy report identify asphyxia as the cause of death, and the death certificate states that the cause of death resulted from "experimentation." While these reports do not conclude specifically that McLaughlin died as a result of autoerotic asphyxiation, the information they present is entirely consistent with such a finding. In addition to considering these reports, AIG took the additional step of obtaining an outside legal opinion as to whether an "intentionally self-inflicted injury" clause provides a basis for denying coverage for autoerotic asphyxiation deaths and did not act unreasonably in following legal advice indicating that a basis for denial exists. *See Hightshue*, 135 F.3d at 1148.

Plaintiffs argue that this was not enough, however, because further inquiry into McLaughlin's sexual history would have revealed that McLaughlin never intended to choke himself. Specifically, plaintiffs argue that AIG should have interviewed McLaughlin's partner, James Hamilton, who would have said that, based on his first-hand knowledge of McLaughlin's sexual practices, he did not think that McLaughlin would have intentionally induced hypoxia.

Plaintiffs' arguments are without merit. AIG obtained sufficient information from Hamilton as well as from McLaughlin's sister Jill, to justify its determination that McLaughlin died from autoerotic asphyxiation. In the police report relied upon by AIG, Hamilton stated that McLaughlin often engaged in "autoerotic activities," which is police parlance for autoerotic asphyxiation. While Hamilton claims that he never used the phrase autoerotic asphyxiation when talking to the police and that the police improperly characterized what he said, he never brought the alleged misunderstanding to AIG's attention at any time, neither during AIG's initial review nor during its consideration of plaintiffs' appeal. Only now do plaintiffs argue that AIG was not entitled to rely on Hamilton's statement in the police report but instead had a duty to interview him directly in order to verify that the statement was true. Demanding such efforts on the part of AIG goes far beyond what a "good-faith" investigation requires, especially where AIG had no reason to believe that the police report might be inaccurate. *Cf. Vega*, 188 F.3d at 298 (finding it inefficient to require an insurance company gather information that is more readily available to the claimant).[7] Additionally, McLaughlin's sister's statement in her letter to AIG that her brother died from asphyxiation while performing a sexual act supports

---

7. Additionally, AIG had no reason to think that it would gain any helpful information from interviewing McLaughlin's friends. Although plaintiffs cite a book by defense expert Dr. Park Dietz indicating that interviewing a decedent's friends and family members can provide useful information about a victim's intent, *see* Robert R. Hazelwood, et al., Autoerotic Fatalities 132–33 (1983), plaintiffs' rationale is inapplicable here. As Dr. Dietz explained in his deposition, acquaintance interviews can assist in distinguishing autoerotic fatalities from suicide, but are not helpful in determining whether an individual intended to self-stimulate through autoerotic asphyxiation rather than through the creation of a visually pleasurable staged masturbation scene.

AIG's conclusion that McLaughlin intended to cut of the oxygen supply to his brain.

■ Nor did AIG also abuse its discretion by electing not to interview the police officers who investigated the death scene. 'laintiffs maintain that interviews with the police would have revealed that the police did not know, based on the evidence at the scene, whether or not McLaughlin intended to choke himself. But the fact that the police did not and could not know McLaughlin's subjective intentions only supports AIG's conclusion that additional police interviews would not yield helpful information.

■ Finally, plaintiffs argue that even if AIG's initial decision not to interview McLaughlin's acquaintances or the police was reasonable, AIG abused its discretion by declining to follow the report of Dr. Gelles, which concluded that McLaughlin did not intend to choke himself. Plaintiffs argument is not persuasive, however, because AIG weighed Dr. Gelles's assertions and only rejected his conclusions when faced with contrary evidence from other experts. First, AIG sought an additional legal opinion from Robert Morris of Epstein, Becker & Green as to whether Dr. Gelles's report would change his legal opinions regarding the case. While Morris told AIG that the facts alleged by Dr. Gelles, if true, would make it more difficult for AIG to prevail in court, especially on summary judgment, he concluded that the report did not change his ultimate conclusion that there was a proper basis for denial of their claim. AIG then sought the opinion of another outside forensic psychologist, Dr. Lewis. Dr. Lewis examined the factual record of the case, as well as Dr. Gelles's report, and concluded that McLaughlin died from asphyxiation and that his asphyxiation resulted from an intentional autoerotic act of partial strangulation. It is not an abuse of discretion for AIG to rely on its own experts rather than on plaintiffs'. Thus, AIG acted reasonably in disagreeing with Dr. Gelles's conclusion.

Moreover, AIG was entitled to conclude that while Dr. Gelles' opinion and description of the crime scene was consistent with his appraisal of McLaughlin's intent, they are also consistent with Dr. Lewis's conclusion that McLaughlin intended to engage in autoerotic asphyxiation. The evidence merely indicates that McLaughlin died from asphyxiation while engaging in an act of sexual gratification. It is entirely possible that McLaughlin intended to use the bondage collar around his neck to engage in autoerotic asphyxiation and it is equally possible that he only intended to use the collar to provide visual stimulation. In short, without being able to talk to McLaughlin himself, it is impossible to know his subjective intent, and the circumstantial evidence available in the case fits both parties' interpretations. Because either plaintiffs' or defendant's interpretation of the events surrounding McLaughlin's death is reasonable, this court cannot conclude that AIG abused its discretion by determining, based on the record at its disposal, that McLaughlin intended to cut off the oxygen supply to his brain.[8]

8. Plaintiffs make an additional contention that AIG's interpretation of the policy is legally faulty because it surreptitiously resurrects the rejected "accidental means" doctrine. Recently, courts have refused to interpret the phrase "accidental means" in insurance plans to exclude coverage for deaths caused by an intentional act on the grounds that the intentional act makes the death non-accidental. *See, e.g., Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1085 (1st Cir.1990). Plaintiffs' argument is inapposite, because the "accidental means" doctrine only applies when the phrase "accidental means" is used in the insurance contract, and is only used to determine whether or not the death is accidental, which is not at issue in this case. *See, e.g., id.* ("A court only will focus on 'accidental means,' though, if the language of the contract specifically speaks of accidental

### 2. Is Partial Strangulation an Injury?

█ Plaintiffs argue that AIG erroneously concluded that partial strangulation is an "injury" within the meaning of McLaughlin's insurance policy. According to plaintiffs, the lack of any lasting or visible effect of the strangulation that accompanies autoerotic asphyxiation indicates that the action is not injurious. AIG responds that regardless of any lasting effect, a reasonable person might conclude that partial strangulation is an injury. This court agrees with AIG.

█ This claim is governed by ERISA because it involves an employee benefit plan. Since ERISA requires terms in benefits plans to "be written in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a), those terms should be given the meaning normally attributed to them by a person of average intelligence and experience. *See Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir.1992). At the time AIG made its decision to deny benefits, two of the three courts to address the issue of partial strangulation found that it was an injury. In *Sims v. Monumental General Insurance Co.*, the Fifth Circuit analogized to criminal law, finding that because a person who partially strangled another person would be criminally liable for that action, partial strangulation was an injury. *See Sims v. Monumental Gen'l Ins. Co.*, 960 F.2d 478, 480 (5th Cir.1992). Similarly, in *Sigler v. Mutual Benefit Life Insurance Co.*, the court held that "[i]f someone else had placed [the decedent] in the same position as he placed himself to temporarily restrict his ability to breathe, it would have been an injury." *Sigler v. Mutual Benefit Life Ins. Co.*, 506 F.Supp. 542, 545 (S.D.Iowa), *aff'd* 663 F.2d 49 (8th Cir.1981). The court then concluded that partial strangulation "continues to be an injury even when it is self-inflicted." *Id.* These cases provide a sufficient basis for AIG's determination that partial strangulation is an injury within the meaning of the policy.

Plaintiffs counter by relying on the third case, *Connecticut General Life Insurance Co. v. Tommie*, in which the Texas Court of Civil Appeals affirmed a jury verdict that partial strangulation was not an injury. *See Connecticut General Life Insurance Co. v. Tommie*, 619 S.W.2d 199, 203 (Tex.Civ.App.1981). In *Tommie*, however, the court merely found that there was some probative evidence to justify the jury's finding, which is a far cry from holding that it would be an abuse of discretion to find that partial strangulation is an injury. Plaintiffs' reliance on *American Bankers Insurance Co. v. Gilberts* is similarly misplaced. In *Gilberts*, the Eighth Circuit refused to find that partial strangulation constitutes an injury as a matter of law because reasonable minds might differ on the matter. *See American Bankers Ins. Co. v. Gilberts*, 181 F.3d 931, 933 (8th Cir.1999). However, the fact that reasonable minds might differ on the question simply proves that it is not an abuse of discretion to decide that partial strangulation is an injury. *See, e.g., Fawcett v. Metropolitan Life Insurance Co.*, 2000 WL

means.") Furthermore, the *Wickman* court, in rejecting the accidental means doctrine, implied that an "intentionally self-inflicted injury" clause could resolve any ambiguity created by the term "accidental means" by holding that the plaintiff in that case would not have been able to recover if he intended to injure himself, notwithstanding the court's rejection of the "accidental means" doctrine.

*See id.* at 1084 ("The policy in this case specifically provides that benefits will not be paid 'for loss directly or indirectly' caused by ... intentionally self-inflicted injury .... [I]f Wickman merely attempted to injure himself and not specifically intend to kill himself (scenario two), again no benefits would be due his widow.").

50

979994 at *7 (S.D.Ohio, June 28, 2000) ("The possibility that reasonable minds may differ on this issue merely confirms that [the insurance company] did not act arbitrarily and capriciously" in finding that partial strangulation is an injury). In sum, there is no support in logic or law for the proposition that AIG abused its discretion in determining that partial strangulation is an injury.

## IV. CONCLUSION

For the reasons set forth in this memorandum, AIG's motion for summary judgment is granted.