Jorita PADFIELD, Plaintiff–Appellant,

v.

AIG LIFE INSURANCE COMPANY, a Corporation, Defendant–Appellee.

No. 00–57054.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2001.

Filed May 17, 2002.

Huey P. Cotton and Rickee S. Stewart, Cozen & Cotton, Los Angeles, CA, for the defendant-appellee.

Before: LEAVY, T.G. NELSON and W. FLETCHER, Circuit Judges.

W. FLETCHER, Circuit Judge.

This suit for recovery of benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, arises from the death of appellant's husband as a result of autoerotic asphyxiation. The insurer refused to pay benefits under an accidental injury and death insurance policy governed by ERISA. The district court held that the death was caused by an intentionally self-inflicted injury, and thus was not covered by the policy. We reverse.

## I. Facts

The relevant facts are not in dispute. On the evening of February 9, 1999, Gerald Alan Padfield told his wife he was going to the cleaners and drove away from his home in the family's van. He never returned. Three days later, a California Highway Patrol trooper noticed the van parked on an empty street next to a vacant lot. When he approached the van, he discovered Mr. Padfield dead on the back-seat floor. According to the coroner's report, Mr. Padfield was found sitting in an upright position behind the front passenger seat with his back against the sliding door. He was naked from the waist down. One end of a necktie was tied around his neck. The other end was tied to the sliding door hinge, which was located directly above him. The two back seats were folded down, and on top of them were numer-

Charles J. Fleishman, Beverly Hills, CA, for the plaintiff-appellant.

ous sexual devices and a backpack. Inside the backpack were pornographic materials and a small bottle containing a liquid later identified as Chlorohexanol, an industrial solvent. Another bottle of the liquid was nearby.

Post-mortem tests found the industrial solvent in Mr. Padfield's blood. The coroner reported that he found no trauma other than a deep ligature mark around the neck. The report stated that the death appeared to be the "accidental" result of autoerotic asphyxiation. The death certificate listed the cause of death as "hanging." Mr. Padfield's wife, who had filed a missing person report when her husband had failed to return from the cleaners, said that there were no personal problems at home and that "everything appeared to be fine." When notified of the circumstances surrounding her husband's death, she told officers that she knew of her husband's sexual devices but thought he had quit using them.

Mrs. Padfield, the appellant, was the beneficiary of an ERISA-governed accidental death insurance policy that covered Mr. Padfield. Appellee AIG Life Insurance Company (AIG) issued the policy as part of an employee benefits plan with Raytheon Systems Company, where Mr. Padfield worked. Mrs. Padfield claimed benefits under the policy, listing the cause of death as "accidental death by hanging." The policy provides for an "accidental death benefit" to be paid "[i]f Injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury." "Injury" under the policy is defined as "bodily injury caused by an accident while this Policy is in force as to the person whose injury is the basis of the claim and resulting directly and independently of all other causes in a covered loss." The policy also contains the following exclusion:

This Policy does not cover any loss caused in whole or in part by, or resulting in whole or in part from, ... suicide or any attempt at suicide or intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury.

AIG invoked this exclusion and rejected the claim.

After pursuing an unsuccessful administrative appeal, Mrs. Padfield filed a complaint in the district court under ERISA, seeking benefits under the policy. Both parties filed motions for summary judgment. The district court granted AIG's motion and denied Mrs. Padfield's motion. It held that Mr. Padfield's death by autoerotic asphyxiation fell outside the policy exclusion for suicide, but fell within the exclusion for death resulting from "intentionally self-inflicted injury." Mrs. Padfield appeals both the denial of her motion and the granting of AIG's motion.

## II. Standard of Review and Applicable Legal Principles

■ Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Ordinarily, the denial of summary judgment is not a final order and is thus unappealable. *See Abend v. MCA, Inc.,* 863 F.2d 1465, 1482 n. 20 (9th Cir.1988). However, an order denying summary judgment is reviewable when, as is the case here, it is coupled with a grant of summary judgment to the opposing party. *Id.; see also United States v. Alameda Gateway Ltd.,* 213 F.3d 1161, 1164 (9th Cir.2000). We review both a denial and grant of summary judgment de novo. *See Alameda Gateway,* 213 F.3d at 1164.

■ A denial of benefits under an ERISA-governed plan is reviewed under a de novo standard "unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Ingram v. Martin Marietta Long Term Disability Income Plan,* 244 F.3d 1109, 1112 (9th Cir.2001). It is undisputed that the plan at issue in this case does not give the administrator such discretion. Thus, we review the administrator's determination de novo.

When faced with questions of insurance policy interpretation under ERISA, federal courts apply federal common law. *Firestone,* 489 U.S. at 110, 109 S.Ct. 948; *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (holding that federal common law of ERISA preempts state law in the interpretation of ERISA benefit plans). Under the federal common law of ERISA, we "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.,* 63 F.3d 837, 840 (9th Cir. 1995) (internal quotations and citation omitted). As we develop federal common law to govern ERISA suits, we may "borrow from state law where appropriate, and [be] guided by the policies expressed in ERISA and other federal labor laws." *Id.* (internal quotations and citation omitted).

### III. Autoerotic Asphyxiation

Autoerotic asphyxiation is "the practice of limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure." *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1450 (5th Cir. 1995). The undisputed evidence indicates that Mr. Padfield engaged in the most common form of this behavior, in which the reduction in oxygen is achieved with the application of pressure to the veins

carrying blood out of the head. *See Am. Bankers Ins. Co. of Florida v. Gilberts,* 181 F.3d 931, 933 (8th Cir.1999). This method requires minimal pressure on the neck. It "essentially keeps blood from leaving the brain, which continues to use oxygen until the oxygen in the blood is depleted enough to give the desired euphoric effect." *Id.* The asphyxial state stimulates nerve centers in the brain, and produces a state of hypercapnia (an increase in carbon dioxide in the blood) and a concomitant state of hypoxia (a decrease in oxygen in the blood), all of which result in an increased intensity of sexual gratification. *See Conn. Gen. Life Ins. Co. v. Tommie,* 619 S.W.2d 199, 202 (Texas Ct. App.1981); *Sims v. Monumental Gen. Life Ins. Co.,* 778 F.Supp. 325, 326 n. 1 (E.D.La.1991). Industrial solvents like the one found near Mr. Padfield are also used to contribute to, or bring about, the same effect. *See Bennett v. Am. Int'l Life Assurance Co. of N.Y.,* 956 F.Supp. 201, 204 (N.D.N.Y.1997) (quoting the Diagnostic and Statistical Manual of the American Psychiatric Association Fourth Edition (DSM–IV), which describes the practice of autoerotic asphyxiation, or "hypoxyphilia," as involving "sexual arousal by oxygen deprivation obtained by means of chest compression, noose, ligature, plastic bag, mask, or chemical (often a volatile nitrate that produces a temporary decrease in brain oxygenation by peripheral vasodilation)").

Autoerotic asphyxiation can result in death, as it did in this case. "Because of equipment malfunction, errors in the placement of the noose or ligature, or other mistakes, accidental deaths sometimes occur. Data from the United States, England, Australia, and Canada indicate that one to two hypoxyphilia—caused deaths per million population are detected and reported each year." *Id.* (quoting DSM IV § 302.83, at 529). But the "use of asphyxia to heighten sexual arousal more

often than not [has] a nonfatal outcome." *Todd,* 47 F.3d at 1457 (citing Hazelwood, Dietz & Burgess, Autoerotic Fatalities 49 (1983)); *see also Tommie,* 619 S.W.2d at 202; *Kennedy v. Wash. Nat'l Ins. Co.,* 136 Wis.2d 425, 401 N.W.2d 842, 845 (App. 1987). Autoerotic asphyxiation "is a repetitive pattern of behavior that individuals engage in over a period of years," and generally "the intent of the individuals performing this act is not death." *Parker v. Danaher Corp.,* 851 F.Supp. 1287, 1290 (W.D.Ark.1994). When performed successfully, the act results only in a temporary decrease in oxygen levels that causes light-headedness, and "usually does not leave visible marks on the neck." *Am. Bankers,* 181 F.3d at 933.

### IV. Policy Exclusions

The policy exclusion at issue here contains two separate exclusions—one for "suicide or any attempt at suicide" and one for "loss caused in whole or in part by, or resulting in whole or in part from ... intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury." We consider each in turn.

#### A. Exclusion for Suicide

■ AIG argues that the policy's suicide exclusion precludes recovery because death by hanging was a "natural and foreseeable consequence" of Mr. Padfield's intentional act. It suggests that the behavior was "so reckless and so likely to result in death" that it is "necessary and appropriate to call the reasonableness of [Mr. Padfield's] expectation of survival into question." Accordingly, AIG argues, the death was not an "accident." The policy provides for an "*Accidental* Death Benefit" that is payable "if injury to the Insured Person results in death within 365 days of the date of the *accident* that caused the Injury" (emphasis added). Thus, if the death was not accidental, the policy is not even triggered, and it is unnecessary to examine the applicability of any exclusion. Alternatively, AIG argues, because the death was not an accident, it was the "functional equivalent of suicide," and therefore the suicide exclusion precludes the payment of benefits.

■ We disagree. A death or injury may be "deemed 'accidental' under a group accidental insurance policy established under ERISA if the death [or injury] was unexpected or unintentional." 10 Couch on Insurance § 139:16 (3d ed. 1995 & 2000 Supp.). In determining whether death, or the injury that caused death, was unexpected or unintentional, courts have undertaken an overlapping subjective and objective inquiry. The court first asks whether the insured subjectively lacked an expectation of death or injury. *See Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1088 (1st Cir.1990) ("Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured."). If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. *See id.* If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct. *See id.; Todd,* 47 F.3d at 1456.

Courts applying the federal common law of ERISA have used a number of slightly different verbal formulations to describe the objective portion of the inquiry. *See, e.g., Todd,* 47 F.3d at 1456 (holding that a subjective expectation of survival is objec-

tively reasonable "if death is not substantially certain to result from the insured's conduct"); *Wickman*, 908 F.2d at 1088–89 (stating a court should determine whether a reasonable person situated as the insured was "would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct"); *Bennett*, 956 F.Supp. at 211 (adopting the rule that a subjective expectation of survival is objectively reasonable if death is not "substantially likely" to result from the insured's conduct). Although the difference between the formulations is not great, *see Todd*, 47 F.3d at 1456 (noting that the "substantially certain" test "followed the essence of" the "substantially likely" test), we agree with the Fifth Circuit in *Todd* that the "substantially certain" test is the most appropriate one, for it best allows the objective inquiry to "serve[ ] as a good proxy for actual expectation." *Wickman*, 908 F.2d at 1088.

The undisputed evidence in this case requires us to conclude that Mr. Padfield's death was "accidental," and was thus not a "suicide" within the meaning of the policy. Autoerotic asphyxiation practitioners expect to survive the experience, and there is nothing to suggest that Mr. Padfield subjectively expected otherwise. Though the record is limited, it appears that Mr. Padfield had a history of engaging in this autoerotic behavior and surviving it. Moreover, there is no evidence that he was distraught or experiencing any personal problems. Because death by autoerotic asphyxiation is statistically rare, his expectation of survival certainly was reasonable.

Even if we could not determine Mr. Padfield's subjective expectations, the same conclusion would be warranted under a purely objective analysis because death is not the "substantially certain" result of autoerotic asphyxiation. We agree with the court's holding in *Todd:* Given the uniform medical and behavioral science evidence indicating that autoerotic activity ordinarily has a nonfatal outcome, "the likelihood of death from autoerotic activity falls far short of what would be required to negate coverage" under an accidental death policy. 47 F.3d at 1456; *see also Bennett*, 956 F.Supp. at 211–12.

Examining the suicide exclusion in its "ordinary and popular sense as would a person of average intelligence and experience," *Babikian*, 63 F.3d at 840, it is clear that the provision does not preclude recovery of benefits. Mr. Padfield "was merely involved in an act designed to enhance his sexual gratification," and we believe that "in the common understanding . . ., [his] death would be regarded as accidental." *Parker*, 851 F.Supp. at 1295. Every court to have considered autoerotic asphyxiation under the federal common law of ERISA has concluded that it is not excluded from coverage by a suicide exclusion. *See, e.g., Todd*, 47 F.3d at 1456–57; *Bennett*, 956 F.Supp. at 212–13; *Parker*, 851 F.Supp. at 1295; *Fawcett v. Metro. Life Ins. Co.*, No. C–3–97–540, 2000 WL 979994 at *4 (S.D.Ohio June 28, 2000).[1] The district court did not err in so holding.

B. Exclusion for "Intentionally Self-Inflicted Injury"

 AIG also argues that Mrs. Padfield may not receive benefits under the policy because Mr. Padfield's death was

---

1. AIG cites to non-ERISA cases decided under state law that hold that a reasonable person would have foreseen that death could result from autoerotic asphyxiation and therefore such a death is not an "accident." *See, e.g., Sigler v. Mutual Benefit Life Ins. Co.*, 663 F.2d 49, 50 (8th Cir.1981) (applying Iowa law); *Int'l Underwriters, Inc. v. Home Ins. Co.*, 662 F.2d 1084, 1087 (4th Cir.1981) (applying Virginia law). For the reasons stated in the text, we do not agree with the conclusion of these state-law cases that autoerotic asphyxiation deaths are not accidental as that term is ordinarily understood.

the result of an "intentionally self-inflicted injury." The district court held for AIG on this ground. We disagree.

Courts addressing the exclusion for "intentionally self-inflicted injury" in cases of death during autoerotic asphyxiation have reached conflicting conclusions. Two courts applying state law have held that individuals who died while engaging in the practice did not "intentionally inflict" upon themselves "bodily injury in the normal and usual meaning of that term." *Tommie*, 619 S.W.2d 199, 203 (Texas Ct.App. 1981); *see also American Bankers Insurance Company of Florida v. Gilberts*, 181 F.3d 931, 933 (8th Cir.1999). Most recently, in *American Bankers Insurance Company of Florida v. Gilberts*, the Eighth Circuit, applying Minnesota law, interpreted a policy that, like the one here, specifically excluded a loss that resulted from "an intentional self-inflicted injury," and defined "injury" as a "bodily injury which is . . . caused by an accident." 181 F.3d at 932. The *American Bankers* court applied a state-law standard that largely parallels the standard used under ERISA federal common law for the interpretation of policy provisions, noting that, under Minnesota law, "[t]erms in insurance policies are to be given the plain and ordinary meaning as would be ascribed to them by a reasonable insured." *Id.* at 933. The court noted that autoerotic asphyxiation, when successfully performed, involves no visible marks on the neck and only de minimis tissue damage, and that there was no evidence "that the procedure involves pain of any kind." *Id.* Accordingly, it held that it could not be said as a matter of law "that a temporary decrease in the oxygen level of the brain, of itself, is a bodily injury in the ordinary sense of the term." *Id.* Two other courts applying state law disagree. *See Sims v. Monumental Gen. Ins. Co.*, 960 F.2d 478, 480 (5th Cir.1992) (applying Louisiana law and holding that "partial strangulation" during autoerotic asphyxia-

tion is an injury in and of itself and that an "intentionally self-inflicted injury" exclusion precludes recovery); *Sigler v. Mutual Benefit Life Ins. Co.*, 663 F.2d 49, 50 (8th Cir.1981) (holding the same under Iowa law).

In the face of this divergence of opinion in cases applying state law, two federal district courts applying the federal common law of ERISA, under an abuse of discretion standard, have held that plan administrators did not act arbitrarily and capriciously in precluding recovery under "intentionally self-inflicted injury" exclusions in cases of autoerotic asphyxiation. *See Hamilton v. AIG Life Ins. Co.*, 182 F.Supp.2d 39, 49–50 (D.D.C.2002) ("the fact that reasonable minds might differ on the question simply proves that it is not an abuse of discretion to decide that partial strangulation is an injury"); *Fawcett*, 2000 WL 979994 at *7 ("The possibility that reasonable minds may differ on this issue merely confirms that [the insurance company] did not act arbitrarily and capriciously" in finding that partial strangulation is an injury and that an "intentionally self-inflicted injury" exclusion precludes recovery). In very recent cases, two district courts applying a de novo standard of review have held that an insured's death while engaging in autoerotic asphyxiation was excluded under provisions similar to the "intentionally self-inflicted injury" provision in this case. *See Critchlow v. First UNUM Life Ins. Co. of America*, 198 F.Supp.2d 318, 323–26 (W.D.N.Y.2002); *Cronin v. Zurich American Ins. Co.*, 189 F.Supp.2d 29, 39 (S.D.N.Y.2002). Both courts acknowledged the "conflicting conclusions" reached by courts interpreting such exclusions in the context of autoerotic asphyxiation. *Cronin*, 189 F.Supp.2d at 38; *see also Critchlow*, 198 F.Supp.2d at 325–26.

As discussed above, we apply a de novo standard of review. Applying that standard, we agree with the courts that have held that autoerotic asphyxiation is not an intentionally self-inflicted injury. Federal courts deciding ERISA claims apply the subjective/objective test discussed above to determine, not only whether a death was accidental, but also whether an injury was "intentionally self-inflicted." The district court correctly observed that this case hinges on whether the physical consequences that Mr. Padfield intended were injuries. If they were injuries, and if they led to his death, the exclusion applies, and AIG correctly denied benefits. All of the evidence indicates that if the events of February 9, 1999 had gone as Mr. Padfield intended, he would have experienced a temporary deprivation of oxygen, a euphoric light-headedness from the exposure to the industrial solvent, and an intensified sexual experience. His oxygen level would then have been restored, his euphoric state would have subsided, and he would have returned home uninjured. None of these consequences is an "injury" as that term is defined in the "ordinary and popular sense [by] person[s] of average intelligence and experience." *Babikian*, 63 F.3d at 840.

As it turned out, of course, events did not go as Mr. Padfield intended. He did not return to consciousness, and the intended physical consequences led to unintended injuries. The necktie tightened, thereby injuring the tissue in his neck and leaving a visible mark; his blood flow was cut off for a sustained period; and he died from a lack of oxygen. The critical question is whether these injuries, which resulted in his death, were "intentionally self-inflicted" within the meaning of the policy exclusion. We believe that the evidence shows that Mr. Padfield's injuries were not "intentionally self-inflicted."

As previously discussed, Mr. Padfield had no subjective intent to cause the injuries that resulted in his death. The next question is whether the suppositions underlying Mr. Padfield's subjective intent were objectively reasonable. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 463 (7th Cir.1997). We conclude that they were. A reasonable person with background and characteristics similar to Mr. Padfield's would not have viewed the strangulation injury that resulted in his death as "substantially certain" to result from his conduct. *Todd*, 47 F.3d at 1456 (stating that an expectation is objectively reasonable if the outcome is not "substantially certain to result from the insured's conduct").

AIG emphasizes that Mr. Padfield voluntarily engaged in a risky activity. This is true, but voluntary risky acts resulting in injury are not necessarily acts that result in "intentionally self-inflicted injury." The analysis of the Seventh Circuit in *Santaella* demonstrates this proposition. The insured in *Santaella* died from an overdose of a prescription pain medication. The record showed that she had voluntarily taken a dangerously large amount of the drug, but the amount was of a size that usually indicated an accidental rather than a deliberate overdose. 123 F.3d at 465. The insurance policy contained an exclusion for death resulting from "intentionally self-inflicted injury." *Id.* Defining that phrase "in the ordinary and popular sense, in the way that a person of average intelligence and experience would interpret" it, *id.* at 463, the court held that the record would not support a determination that the insured "did anything other than make a fatal mistake." *Id.* at 465. "It is undisputed that she took the drug voluntarily, but nothing in the record indicates that she intended to take an overdose or that she intended to inflict injury on herself." *Id.*

This case is analytically identical to *Santaella*. Mr. Padfield voluntarily engaged in actions that led to a fatal injury, but his reasonable expectation was that this behavior would not have resulted in "injury" as that word is commonly defined. Given both the usual pattern of autoerotic asphyxiation and the statements by Mrs. Padfield, the undisputed facts in this case show that Mr. Padfield, having performed the act in the past without inflicting any injury, had a reasonable expectation that he would be able to do so again. Thus, like the insured in *Santaella*, Mr. Padfield "did not die from an intentionally self-inflicted injury." *Id.* at 465. Rather, he made a "fatal mistake." *Id.* "Generally, insureds purchase accident insurance for the very purpose of obtaining protection from their own miscalculations and misjudgments." *Wickman*, 908 F.2d at 1088.

### Conclusion

■ Congress, in adopting ERISA, expected that "a federal common law of rights and obligations under ERISA-regulated plans would develop[.]" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Based on this common law, we hold that the suicide exclusion does not preclude recovery. Likewise, guided both by the subjective/objective analysis employed in other ERISA cases and by the mandate that we read provisions in an ERISA-governed policy in their "ordinary and popular sense," *Babikian*, 63 F.3d at 840, we also hold that recovery is not precluded by the exclusion for death resulting from "intentionally self-inflicted injury."

The district court's orders granting summary judgment to insurer AIG and denying summary judgment to Mrs. Padfield are both REVERSED.

LEAVY, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's conclusion in Part IV(A) that Mr. Padfield's death was not a "suicide" within the meaning of the policy. However, I disagree with the majority's conclusion in Part IV(B) that the injuries resulting in Mr. Padfield's death were not "intentionally self-inflicted." I would hold, as a matter of law, that Mr. Padfield's act of tying a necktie around his neck with the intent to restrict the flow of oxygen to his brain was an intentionally self-inflicted injury which resulted in his death. The policy excludes coverage for such a loss.

### A. *The Policy Terms*

The policy provides coverage as follows: "If Injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury, the Company will pay 100% of the Principal Sum." The policy defines "injury" as "bodily injury caused by an accident." The policy excludes coverage for "any loss caused in whole or in part by, or resulting in whole or in part from the following:"... "any intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury."

An intentionally self-inflicted injury has three elements: (1) an act upon oneself; (2) done with intent to injure; and (3) an injury. If the act is done with intent to kill (not injure) one's self, this is suicide, and the policy excludes coverage for such a loss. The majority states that "this case hinges on whether the physical consequences that Mr. Padfield intended were injuries," and concludes that "the intended physical consequences led to unintended injuries." The policy language does not speak in terms of "intended physical consequences" or "unintended injuries." When interpreting terms in ERISA insurance policies, we adopt a reasonable inter-

pretation of the policy language and avoid torturing or twisting the language of the policy. *See Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990). The only inquiry we should be making under the terms of the .policy is whether Mr. Padfield's injuries, which resulted in his death, are intentionally self-inflicted.

The majority concludes Mr. Padfield intended to tighten the necktie, but did not intend to injure the tissue in his neck, leave a visible mark, or cut off his blood flow for a sustained period, which were "fatal mistakes." For such a proposition, the majority relies upon *Santaella v. Metro. Life Ins. Co.,* 123 F.3d 456 (7th Cir. 1997) where the court held the .insured's death from the voluntary ingestion of propoxyphene (commonly known as Darvon) was not an intentionally self-inflicted injury. *Santaella,* 123 F.3d at 465. In *Santaella,* there was nothing in the record to indicate that the insured intended to inflict injury upon herself by ingesting the legal, prescription painkiller. While the record in *Santaella* revealed that the insured had abused drugs five years before and had a damaged spleen, there was nothing in the record indicating that, in the incident which resulted in her death, the insured intended to injure herself. The insured had taken a relatively low level of the prescription drug for a fatal dosage, and the pathologist noted that a person could develop increasing levels of tolerance for the prescription and thus could take mistakenly a lethal dose of the drug.[1] *Santaella,* 123 F.3d at 464.

By contrast, in the present case, Mr. Padfield intended to restrict the flow of oxygen to his brain by self-asphyxiation with a necktie. This intentional act inflicted an injury from which Mr. Padfield never recovered. Whether such an intentional act leaves ligature marks on the deceased's body is of little or no significance. Mr. Padfield's intentional act of injuring his brain rendered it incapable of functioning. His intentional act caused injury to a live organ. This injury to his brain rendered it incapable of saving him from death. This is an intentionally self-inflicted injury which resulted in death. Such a loss is not covered under the terms of the policy.

### B. The Decision is Contrary to ERISA Case Law

None of the ERISA cases concerning policy coverage for death from autoerotic asphyxiation support the majority's position. There are, to date, seven ERISA cases which concern policy coverage for a death from autoerotic asphyxiation. In four recent cases, which are factually and procedurally similar to the present case, death resulting from autoerotic asphyxiation was excluded from coverage because the policy contained a self-inflicted injury exclusion: *Critchlow v. First UNUM Life Ins. Co.,* 198 F.Supp.2d 318 (W.D.N.Y. 2002); *Cronin v. Zurich American Ins. Co.,* 189 F.Supp.2d 29 (S.D.N.Y. Feb.19, 2002); *Hamilton v. AIG Life Insurance Company,* 182 F.Supp.2d 39 (D.D.C.2002); *Fawcett v. Metro. Life Ins. Co.,* 2000 WL 979994 (S.D.Ohio June 28, 2000). In these four cases, the policy at issue contained *both* a policy exclusion for suicide *and* a policy exclusion for intentionally self-inflicted injuries, which are virtually identi-

---

1. Accidental deaths resulting from autoerotic asphyxiation are factually and analytically distinguishable from accidental deaths resulting from drugs. In our society, people regularly ingest prescription and nonprescription drugs with widely disparate results. Some accidental death insurance policies specifically exclude coverage for the taking of drugs or asphyxiation from the inhaling of gas, when done on a voluntary basis, but the exclusion does not apply to drugs that are taken on the advice of a physician. *See Schadler v. Anthem Life Insurance Company,* 147 F.3d 388, 392 (5th Cir.1998).

cal to the summary plan exclusions in this case.

In *Critchlow*, the court, reviewing *de novo*, concluded that the decedent's death was an "intentionally self-inflicted injury." *Critchlow*, 198 F.Supp.2d at 327–28. The court reasoned:

> In support of her position, plaintiff points to evidence that decedent himself had engaged in this practice on more than once occasion prior to February 26, 1999. This evidence indicates that it is possible to engage in autoerotic asphyxiation without dying, or even without losing consciousness. From that evidence, plaintiff argues that such activity need not cause injury to the person engaged in it. That one *may* survive autoerotic asphyxiation without suffering any major injury is not dispositive, however. The fact remains that autoerotic asphyxiation, as practiced by decedent, requires not just a slight amount of pressure, or a negligible reduction of the flow of oxygen, but a significant deprivation of oxygen to the brain—in other words, strangulation. Any definition of "injury" that excludes strangulation—whether fatal or not—is simply unreasonable.

198 F.Supp.2d at 326–27.

In *Cronin*, the court, reviewing *de novo*, held that the purposefully self-inflicted injury exclusion encompassed the act of autoerotic asphyxiation. *Cronin*, 189 F.Supp.2d at 39. The court reasoned:

> Although Cronin may not have intended to cause *permanent* injury, his intention to restrict the flow of blood and oxygen to his brain in order to impair his mental processes was a "hurt" to his physical and mental being, and risked death. Causing oneself "hurt" or "harm" is an injury to one's own body whether inflicted in the search for delight or in the search for pain; both

expose the practitioner to a substantially increased risk of accidental death. Cronin may have intended that the "mischief" he caused himself could be reversed by timely intervention, but his "hurt" so affected his state of being as to become irreversible. Under the plain language of the policy exclusion, Cronin's death was "caused by, contributed to, or resulted from a purposely self-inflicted injury."

189 F.Supp.2d at 40.

In *Hamilton* and *Fawcett*, the plan administrator concluded that the insured's death resulting from autoerotic asphyxiation was an "intentionally self-inflicted injury" that resulted in death, thus precluding coverage. The *Fawcett* court stated:

> In the foregoing examples, death was unintended and, therefore, accidental. Similarly, in the present case, Mr. Fawcett derived some sexual satisfaction from intentionally restricting the flow of oxygen to his brain, and he intended to live to enjoy it. *His* death was likewise unintended, and hence, accidental. Nevertheless, the action that he took to achieve the benefit was an intentionally self-inflicted injury that resulted in his death, despite his intentions to the contrary. Accordingly, the terms "accidental death" and "intentionally self-inflicted injury" are not mutually exclusive. This reasoning is best illustrated through [the] following syllogism:
> 1) Mr. Fawcett's death was caused by the intentional restriction of oxygen to his brain.
> 2) To restrict the flow of oxygen to the brain is to inflict injury upon oneself.
> 3) Therefore, Mr. Fawcett's death was caused by an intentionally self-inflicted injury.

2000 WL 979994, *6 (emphasis in original).

Both the *Fawcett* court and the *Hamilton* court were reviewing the plan adminis-

trator's denial of coverage under the abuse of discretion standard, and, in this case, like the *Critchlow* and *Cronin* cases, we are reviewing the denial of coverage de novo. The facts and reasoning in these four ERISA cases are directly applicable to this case, and, upon our de novo review, the result should be the same. To intentionally restrict the flow of oxygen to the brain by self-asphyxiation, even without intent to be fatal, is to inflict, intentionally, injury upon oneself.

Three additional ERISA cases analyze accidental insurance coverage for death from autoerotic asphyxiation and state, in dicta, that coverage *would have been denied* had the policy contained an exclusion for intentionally self-inflicted injuries. In those cases, *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448 (5th Cir.1995); *Bennett v. Am. Int'l Life Assurance Co. of N.Y.*, 956 F.Supp. 201 (N.D.N.Y.1997); and *Parker v. Danaher Corp.*, 851 F.Supp. 1287 (W.D.Ark.1994), the insurance policies contained coverage for deaths by accident, with an exclusion of coverage for suicide, but contained no exclusion of coverage for intentionally self-inflicted injuries.[2]

## C. *The non-ERISA case law does not support the majority's holding*

The majority fails to explain adequately why it rejects federal ERISA cases involving death from autoerotic asphyxiation, and instead follows two lone non-ERISA cases which apply state law. The majority overstates this case law support when it says that two courts applying state law "have held" that autoerotic asphyxiation is not an intentionally self-inflicted injury. In the two non-ERISA cases relied upon by the majority, the courts *left it to a jury* to decide whether autoerotic asphyxiation is an intentionally self-inflicted injury. In the present case, the majority goes beyond *any* reported case by holding that, *as a matter of law*, autoerotic asphyxiation is not an intentionally self-inflicted injury.

The majority relies upon *American Bankers Ins. Co. of Florida v. Gilberts*, 181 F.3d 931 (8th Cir.1999), where the court, applying Minnesota law, reversed the district court's grant of summary judgment for the insurance company and remanded for trial on the issue of whether the intended act of the temporary change in blood flow by self-asphyxiation constitutes a bodily injury. *American Bankers,*

---

**2.** The Fifth Circuit in *Todd* stated:

> We add this postscript to this part of the case. It may be that all this writing is necessary to affirm this part of the judgment for appellee, but it is doubtful that it should have any longlasting significance for deciding cases like this. The life insurance companies have ample ways to avoid judgments like this one.

47 F.3d at 1457.

The *Bennett* court cited *Sims v. Monumental General Ins. Co.*, 960 F.2d 478, 480 (5th Cir.1992), which held that partial strangulation is an injury in and of itself and the policy excluded death resulting from an intentionally self-inflicted injury. The *Bennett* court stated that "because there is not self-inflicted injury exclusion in the instant policy, and because the *Sims* court never reached the issue of accidental death, its reasoning is of little value here." *Bennett*, 956 F.Supp. at 207. The

*Bennett* court also cited the *Todd* court's postscript: "The life insurance companies have ample ways to avoid judgments like this one." 956 F.Supp. at 210.

The court in *Parker* stated that the insured would not be covered had the policy contained an exclusionary clause for injury resulting from an intentionally self-inflicted injury. The court stated:

> We hasten to say that we are not faced in this case with an exclusionary clause for injury resulting directly or indirectly from an intentionally self-inflicted injury. The [foreseeability] standard advanced by the defendants merges in the court's view policy definition of injury with typical policy language, not present herein, excluding loss caused by intentionally self-inflicted injury.

851 F.Supp. at 1295.

181 F.3d at 933. The court did not "hold" that autoerotic asphyxiation is not an intentionally self-inflicted injury. The court noted that the two parties' expert witnesses were split on the question of whether the change in blood flow is an injury. The court stated that there was "essentially no evidence advanced for purposes of summary judgment (but there may be at trial) that an individual's body is any different after the performance of partial asphyxia in this manner than it was before ..." *Id.*

The majority also relies upon *Connecticut Gen. Life Ins. Co. v. Tommie*, 619 S.W.2d 199 (Tex.Civ.App.1981), which was in a much different procedural posture than this case. The Texas intermediate appellate court was reviewing a jury's finding that the decedent's death resulting from autoerotic asphyxiation was neither the result of a suicide nor the result of a self-inflicted injury. The Texas court concluded that if there was "any probative evidence to support that finding, we must uphold the verdict in that respect." *Tommie*, 619 S.W.2d at 203. The court noted that Mr. Tommie placed a pad between the rope and his neck and there was "no evidence that the rope inflicted any external injury to his body." *Id.* The procedural posture of the instant case makes it readily distinguishable from *Tommie*.

If one looks to cases applying state law rather than ERISA cases, there are two cases which hold that, as a matter of law, an insured's death from autoerotic asphyxiation was not a covered loss because the policy excluded death from "intentionally self-inflicted injury." In *Sims v. Monumental Gen. Ins. Co.*, 960 F.2d 478, 480 (5th Cir.1992), the Fifth Circuit, applying Louisiana law, stated that the only question was whether partial strangulation was an "injury." The court cited the undisputed expert opinion that partial strangulation deprived the brain of valuable oxygen, and the court concluded that partial strangulation is an injury in and of itself. *Sims*, 960 F.2d at 480. *See also Sigler v. Mutual Benefit Life Ins. Co.*, 663 F.2d 49, 50 (8th Cir.1981) (Applying Iowa law, death from autoerotic asphyxiation was not a covered loss as a matter of law because the policy excluded coverage for "intentionally, self-inflicted injury of any kind.").

### CONCLUSION

Because the majority's holding is not supported by the policy language, is contrary to ERISA case law, and is not supported by the holdings in non-ERISA case law, I would affirm the district court's grant of summary judgment in favor of AIG.

I respectfully dissent.