**Susan E. LEE, Plaintiff,**

v.

**SUN LIFE ASSURANCE COMPANY OF CANADA, Defendant.**

**No. CV 08–140–ST.**

United States District Court, D. Oregon.

Dec. 23, 2009.

Brian Richard Whitehead, Law Offices of Brian R. Whitehead, PC, Salem, OR, for Plaintiff.

William T. Patton, Lane Powell, PC, Portland, OR, for Defendant.

## OPINION AND ORDER

REDDEN, District Judge:

On June 9, 2009, Magistrate Judge Janice Stewart filed her Findings and Recommendation (doc. 32) that the court deny defendant's motion for summary judgment (doc. 19), grant plaintiff's cross-motion for summary judgment (doc. 25), and enter judgment in favor of plaintiff.

The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Civil Procedure 72(b) and 54(d)(2)(D). The district court is not bound by the recommendations of the magistrate judge, and "may accept, reject, or modify the recommended decision, re-

ceive further evidence, or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72(b). When either party timely objects to any portion of the magistrate's Findings and Recommendation, the district court must conduct a *de novo* review of those portions of the magistrate's report. 28 U.S.C. § 636(b)(1)(C); Fed. R.Civ.P. 72(b); *McDonnell Douglas Corp. v. Commodore Bus. Machines*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). The district court is not, however, required to review the factual and legal conclusions to which the parties do not object. *Thomas v. Arn*, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985): *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003).

Defendant timely filed objections to Magistrate Judge Stewart's findings that: (1) defendant's denial of plaintiff's accidental death and dismemberment ("AD & D") claim should be reviewed with a "high level of skepticism" because the claim determination was affected by a "significant" conflict of interest; and (2) defendant's determination that plaintiff's claim was barred under the AD & D plan's criminal act exclusion was an abuse of discretion. I have, therefore, given those portions of the Findings and Recommendation a *de novo* review. I agree with Magistrate Judge Stewart's analysis and conclusions.

■ Magistrate Judge Stewart's finding that defendant operated under a "significant" conflict of interest in denying plaintiff's AD & D claim was based on defendant's: (1) failure to proffer evidence that its structural conflict of interest did not influence the decision-making process; (2) failure to adequately investigate plaintiff's claim; and (3) improper emphasis on evidence favorable to the denial of benefits, while ignoring evidence favorable to a grant of benefits. With respect to defen-

dant's failure to adequately investigate plaintiff's claim, Magistrate Judge Stewart found that defendant failed to conduct "any independent investigation of the circumstances surrounding Mr. Lee's death," and never sought or obtained:

any evidence concerning the reasoning behind the design of the trestle, including its pedestrian-friendly features such as a walkway, handrails, and a safety island; ... any actuarial analysis regarding whether it was highly likely that crossing the trestle would result in serious injury or death; ... any evidence regarding when the "No Trespassing" sign(s) were installed and the reasoning behind their design and placement; ... any further evidence concerning the number of pedestrians who cross the trestle on a daily basis; ... any evidence that the police had ever cited or prosecuted pedestrians with criminal trespass as a result of walking on or across the trestle; and ... any statement from representative(s) of the railroad companies whose name(s) are on the "No Trespassing" sign(s).

Findings and Recommendation, at 1137. Magistrate Judge Stewart also found that defendant's first explanation for its denial of benefits—that Mr. Lee's death was not due to "accidental means"—"ignores and is contrary to the only relevant evidence in the record." *Id.* at 1138. Balancing all of these case-specific factors, as the Ninth Circuit has instructed, Magistrate Judge Stewart properly concluded that the record evidenced a "significant" conflict of interest and therefore, defendant's stated bases for its denial were subject to enhanced skepticism. *Montour v. Hartford Life & Accident Insurance*, 588 F.3d 623, 629–31 (9th Cir.2009).

I am not persuaded that defendant's "new" evidence proves otherwise. That defendant has taken steps to reduce potential bias and promote accuracy in its claims review process does not undermine Magis-

trate Judge Stewart's conclusion that defendant's decision *in this case* was affected by a significant conflict of interest. Defendant's "new" evidence does nothing to rebut Magistrate Judge Stewart's findings that defendant failed to adequately investigate plaintiff's claim, improperly emphasized evidence favorable to the denial of benefits, ignored evidence favorable to a grant of benefits, and provided a reason for denial that was not supported by any evidence in the record. Weighing all of these case-specific factors together, including defendant's structural conflict of interest, I agree with Magistrate Judge Stewart that defendant's denial of benefits should be viewed with enhanced skepticism.

 Viewing defendant's decision with a heightened level of skepticism, I agree with Magistrate Judge Stewart's conclusion that defendant abused its discretion by: (1) concluding that Mr. Lee's death was "not accidental" without providing any explanation; and (2) improperly ignoring substantial evidence in the record indicating that the train trestle was "open to the public" under Oregon law. Accordingly, I ADOPT Magistrate Judge Stewart's Findings and Recommendation in its entirely. I DENY defendant's motion for summary judgment (doc. 19), and GRANT plaintiffs cross-motion for summary judgment (doc. 25).

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATIONS

STEWART, United States Magistrate Judge:

### *INTRODUCTION*

Plaintiff, Susan E. Lee, filed this action to recover accidental death and dismemberment ("AD & D") benefits under an employee benefit plan sponsored by her employer, Triad Hospitals, Inc. ("Triad").

Triad funded the AD & D benefits through a group insurance plan ("AD & D Plan") issued and underwritten by defendant, Sun Life Assurance Company of Canada ("Sun Life"), which is also the claims administrator for the AD & D Plan. Plaintiff, a Triad employee, obtained $500,000 in coverage under the AD & D Plan for her husband, James Lee ("Mr. Lee").

Mr. Lee died on July 22, 2006, the day after he was struck by an oncoming train while on a railroad trestle in McMinnville, Oregon. Plaintiff then made a claim for $500,000 in benefits under the AD & D Plan in connection with his death. After Sun Life denied her claim, plaintiff filed a Complaint in the Circuit Court of the State of Oregon for Yamhill County, alleging a breach of contract claim against Sun Life. On January 31, 2008, Sun Life timely removed that action to this court based on complete preemption under the Employee Retirement Income Security Act, 29 USC §§ 1001–1461 ("ERISA"), and diversity jurisdiction.

On September 29, 2008, 2008 WL 4449875, this court granted a previous motion for summary judgment filed by Sun Life and clarified that Lee's breach of contract claim is preempted by ERISA. Order (docket # 18), adopting Findings and Recommendation (docket # 15). Plaintiff's claim is therefore properly reviewed as an ERISA claim to recover benefits under the AD & D Plan, and the plan administrator's decision to deny benefits under the AD & D Plan is reviewed by the court for an abuse of discretion as modified by the standards set forth in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir.2006).

Sun Life then filed a second Motion for Summary Judgment (docket # 19), contending that Lee's claim is barred under the criminal act exclusion of the AD & D Plan. In response, plaintiff filed a Cross Motion for Summary Judgment (docket

\# 25), asserting that a structural conflict of interest mandates the lowest level of deferential review and that the criminal act exclusion is inapplicable to Mr. Lee's act of walking across the train trestle or is ambiguous and must be interpreted in her favor. For the reasons that follow, plaintiff's motion should be granted, Sun Life's motion should be denied, and judgment should be entered in favor of plaintiff.

### *LEGAL STANDARD*

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.,* 180 F.3d 1047, 1054 (9th Cir.1999) (citation omitted). A " '*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' " does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* (citation omitted).

### *UNDISPUTED FACTS*

#### I. *The AD & D Plan*

As a Triad employee, plaintiff was eligible to participate in various employee benefit plans sponsored by her employer, including voluntary employee and dependent AD & D coverage. Ex. A, pp. 1–4.[1] That coverage was provided through a group insurance policy that Triad obtained from Sun Life, which is the AD & D Plan at issue in this case. Under the terms of the AD & D Plan, Sun Life has discretionary authority to interpret the terms of the policy and to make all final determinations regarding claims for benefits. *Id.* at 28.

Under the AD & D Plan, a Triad employee could obtain AD & D coverage for herself and her dependents, including a spouse. *Id.* at 5. The AD & D Plan contains the following exclusion, known as the "criminal act" exclusion:

> No Accidental Death or Dismemberment payment will be made for a loss which is due to or results from ... committing or attempting to commit an assault, felony or other criminal act.

*Id.* at 19.

Plaintiff obtained $500,000 in AD & D coverage for her husband, Mr. Lee. Ex. B, p. 111.[2] In addition, plaintiff also obtained basic dependent life insurance coverage in

---

**1.** A copy of the AD & D Plan, the "entire claim file for plaintiff's claim for benefits under the AD & D Plan," including "all documents that Sun Life relied upon in making its decision as well as all correspondence that Sun Life sent or received in connection with plaintiff's claim," and a copy of the Life Policy are attached as Exhibits A, B, and C to the Declaration of Oriana R. Harris (docket # 21). All citations to those documents are to the Exhibit letter.

**2.** Plaintiff filed for divorce in mid-July 2006, but the divorce was not final on the date of Mr. Lee's death. Harris Decl., Ex. B, p. 27; *In re Marriage of Susan Lee and James Lee,*

the amount of $25,000 through a group insurance policy that Triad obtained from Sun Life (the "Life Policy"). *Id.* at 178; Ex. C, pp. 1–3.

## II. *Death of James Lee*

On July 21, 2006, Mr. Lee spent the evening at the Blue Moon, a bar in downtown McMinnville. Ex. B, p. 43. At approximately 10 p.m., he left the Blue Moon and proceeded to walk towards his home. *Id.* Rather than use surface streets, Mr. Lee chose to traverse a train trestle which crosses over the Cozine Creek ravine to his home on the south side of the ravine. *Id.* at 34, 45, 68, 73. A paved roadway (Ford Street) runs parallel to the train trestle, allowing pedestrians to pass between the north and south banks of the ravine without walking on the trestle, although the record does not reveal the distance from the trestle to the paved roadway. *Id.* at 36.

The trestle runs in a north-south direction, is approximately 525 feet long, and stands at least 33 feet above the ravine. *Id.* at 48–49. Visibility on the trestle is poor due to the presence of trees which creates a "tunnel like appearance." *Id.* at 16. At the time of the incident, a "No Trespassing" sign was posted on the south end of the trestle, but was spray painted with graffiti and difficult to read.[3] *Id.* at 7, 51–52, 66–67.

At some point between 10:00 p.m. and 11:00 p.m. on July 21, 2006, Mr. Lee was struck by a train while on the trestle. *Id.* at 34, 48, 68. Perhaps due to the poor visibility, the train's conductor never saw

Mr. Lee on the tracks.[4] *Id.* at 28. The train likely struck Mr. Lee at its normal rate of speed of 10–15 miles per hour. *Id.* at 43. Mr. Lee's left foot was severed as a result of the impact. *Id.* at 42.

Shortly after being hit by the train, Mr. Lee was found by another pedestrian using the trestle, Alex Martinez ("Martinez"). *Id.* at 34. When asked what had happened, Mr. Lee responded that he had suffered a heart attack. *Id.* Martinez immediately went to his uncle's house (which was nearby) and called 911. *Id.* He then returned to the trestle to stay with Mr. Lee until the ambulance arrived. *Id.* Mr. Lee was transported to the Willamette Valley Medical Center, but died the following morning as a result of his injuries. *Id.* at 68, 174.

## III. *Payment of Dependent Life Insurance Benefits*

On September 7, 2006, plaintiff filed a claim for $25,000 in basic dependent life insurance benefits under the Life Policy. *Id.* at 175–78. The dependent life insurance under the Life Policy contains no criminal act exclusion. Ex. C, pp. 7–10. On October 24, 2006, Sun Life paid plaintiff $25,010.27, the full amount due under the basic Life Policy. Ex. B, pp. 162–64.

## IV. *Denial of AD & D Benefits*

Plaintiff also made a claim for $500,000 in benefits under the AD & D Plan. *Id.* at 151–55. Sun Life received plaintiff's claim for benefits some time between October 18, 2006, and January 24, 2007. *Id.* at 151–55, 175–79.[5] On March 29, 2007, Sun

Yamhill County Circuit Court Case No. DO 060391.

**3.** As discussed below, it is disputed whether a "No Trespassing" sign was also posted on the north end of the trestle at the time of Mr. Lee's death.

**4.** Sun Life submitted evidence concerning Mr. Lee's blood-alcohol level, but that factual in-

formation is irrelevant to the issues before this court.

**5.** Two copies of the claim appear in the record, with one labeled as a "Second Attempt." Ex. B, p. 155. It is unclear why identical claims were submitted three months apart.

Life sent a letter to plaintiff denying her claim under the AD & D Plan. *Id.* at 105–06. The letter cites no policy definition or Oregon statute. Instead, it quotes the criminal act exclusion and gives the following explanation for the denial:

> [W]e have determined that:
>
> 1. The injuries resulting in James['] death were reasonably foreseeable and were the natural and probable result of conduct knowingly undertaken and therefore, were not due to accidental means.
>
> 2. Trespassing on a railroad trestle is considered a criminal act in the State of Oregon, and therefore falls within the policy exclusion applicable to "committing or attempting to commit an assault, felony or other criminal act."

*Id.* at 106.

## V. *Appeal*

On August 10, 2007, plaintiff's attorney wrote to Sun Life, asserting that the trestle was both "open to the public" and that, by its inaction in the face of repeated pedestrian use of the trestle, the railroad had impliedly consented to the pedestrian use, negating the assertion that Mr. Lee had engaged in criminal trespass when he walked across the trestle. *Id.* at 56–58. That letter enclosed an affidavit from Richard Schoenthal ("Schoenthal"), who lives near the trestle, newspaper articles regarding use of the trestle, and pictures of the area.[6]

On December 3, 2007, Sun Life issued its final denial letter. *Id.* at 1–3. Sun Life again gave two reasons for the denial. First, again without citing the policy provision on which it relied, Sun Life concluded that the "injuries resulting in Mr. Lee's death were reasonably foreseeable and were the natural and probable result of conduct knowingly undertaken and there-

fore, were not due to accidental means." *Id.* at 2. Second, Sun Life concluded that "Mr. Lee's death resulted from his trespassing on a railroad trestle" in violation of ORS 164.255(1)(c). *Id.* Sun Life rejected the notion that the trestle was "open to the public," citing: (1) the presence of "No Trespassing" signs on each end of the trestle that Mr. Lee "must have noticed . . . on this and prior trips across the trestle;" (2) the physical nature and function of the trestle "to permit the rapid travel of large heavy trains, not pedestrians;" (3) Martinez's concern that the police would issue him a citation for trespassing; and (4) the lack of evidence "that the railroad that owns the trestle consented to Mr. Lee's trespass." *Id.*

## *FINDINGS*

This dispute centers on Sun Life's application and interpretation of two provisions in the AD & D Plan. First, Sun Life found that Mr. Lee's death was not due to "accidental means" based on "conduct knowingly undertaken" by Mr. Lee. *Id.* at 2, 106. Second, Sun Life applied the criminal act exclusion and determined that by walking on the trestle, Mr. Lee committed a criminal trespass within the meaning of Oregon law.

Plaintiff contends that Sun Life's decision was tainted by a conflict of interest, and that its interpretation of these two provisions was an abuse of discretion. In particular, plaintiff argues that no evidence supports Sun Life's conclusion that Mr. Lee's injuries were not accidental. Plaintiff also asserts that the criminal act exclusion does not apply to misdemeanors such as criminal trespass, must be interpreted in her favor for a variety of other reasons, and, in any event, was misapplied because the evidence indicates that the trestle was

---

6. Two copies of plaintiff's submission appear in the record (Ex. B, pp. 56–76 and 77–97), with one set of the photographs apparently sent by plaintiff's attorney (*id.* at 98–103).

"open to the public." For the reasons explained below, this court agrees with plaintiff that Sun Life's decision must be viewed with heightened skepticism and, when viewed in that light, it was an abuse of discretion.

## I. Conflict of Interest

### A. General Standards of Review

ERISA does not specify a standard of review. Filling that statutory gap, courts apply either a *de novo* or an arbitrary and capricious standard of review, depending on whether the administrator has the discretion to interpret the terms of the plan or make benefits determinations. A denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Abatie,* 458 F.3d at 962–63. However, if the plan vests the administrator with such discretionary authority, then the court reviews the plan administrator's decision only for an abuse of discretion. *Firestone Tire & Rubber Co.,* 489 U.S. at 115, 109 S.Ct. 948. The term "arbitrary and capricious" also describes this deferential standard of review. *See Dytrt v. Mountain State Tel. & Tel. Co.,* 921 F.2d 889, 894 (9th Cir.1990).

No deference to the plan administrator is given under *de novo* review. In contrast, under the arbitrary and capricious standard of review, an administrator's decision "is not arbitrary unless it is 'not grounded on any reasonable basis.'" *Horan v. Kaiser Steel Ret. Plan,* 947 F.2d 1412, 1417 (9th Cir.1991) (emphasis in original), quoting *Oster v. Barco of Cal. Employees' Ret. Plan,* 869 F.2d 1215, 1219 (9th Cir.1988). Also, an arbitrary and capricious standard of review normally limits the court's consideration to the evidence reviewed by the plan administrator at the time the eligibility decision was made. *McKenzie v. Gen. Tel. Co. of Cal.,* 41 F.3d 1310, 1316 (9th Cir.1994), *cert. denied* 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995); *Taft v. Equitable Life Assur. Soc.,* 9 F.3d 1469, 1471 (9th Cir.1993).

Because Sun Life had discretion to interpret and make final decisions under the terms of the AD & D Plan, "*de novo* review does not apply; abuse of discretion review does." *Abatie,* 458 F.3d at 965. However, by acting both as the plan administrator and the funding source for plan benefits, Sun Life was operating under what the Ninth Circuit calls a "structural conflict of interest."

The presence of the conflict must be weighed by the reviewing court and given such weight as the court deems proper in determining whether the administrator's decision withstands scrutiny. *Id.* at 968. The Ninth Circuit has expressly rejected the "sliding scale" approach adopted by several other circuits in favor of a "straightforward abuse of discretion analysis." *Id.* at 967–68 (citing cases). Under that analysis, the presence of a structural conflict of interest in and of itself does not automatically garner sufficient weight to overrule a plan administrator's decision. Instead, depending on the surrounding circumstances, the conflict of interest may be viewed with a range of skepticism:

> An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might.... The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims—granting history. A court may weigh a conflict more heavily if, for

example, the administrator provides inconsistent reasons for the denial, fails to adequately investigate a claim or ask the plaintiff for necessary evidence, or has repeatedly denied benefits by deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* at 968–69 (citations omitted).

█ A variety of factors may be considered, including the monetary conflict (structural conflict of interest), the emphasis by the administrator of evidence favorable to a denial of benefits and de-emphasis of unfavorable evidence, inconsistent explanations for claims denials, the presence of procedural irregularities in the claims process, and evidence which tends to show bias or bad faith. *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2351–52, 171 L.Ed.2d 299 (2008) (financial incentives, emphasis of evidence favoring denial of benefits, failure to provide independent experts all relevant evidence); *Nolan v. Heald College,* 551 F.3d 1148, 1155 (9th Cir.2009) (bias); *Abatie,* 458 F.3d at 968 (inconsistent reasons for claims denial, failure to adequately investigate, failure to credit reliable evidence, making decisions against the weight of the evidence); *Friedrich v. Intel Corp.,* 181 F.3d 1105, 1110 (9th Cir.1999) (procedural irregularities in initial claims process and unfair appeal process); *Lang v. Long–Term Disability Plan,* 125 F.3d 794, 797 (9th Cir.1997) (inconsistent reasons). The reviewing court must make "something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie,* 458 F.3d at 969. Moreover, evidence which might materially affect the abuse of discretion standard of review must be viewed "through the lens of the traditional rules of summary judgment" and in the light most favorable to the non-moving party. *Nolan,* 551 F.3d at 1154–55.[7]

## B. *Nature of Conflict of Interest*

When evaluating a claim that a plan administrator improperly denied benefits, this court must first "consider the precise contours of the abuse of discretion standard ... before determining whether the applicable standard was violated." *Nolan,* 551 F.3d at 1154. An exhaustive review of the record indicates that Sun Life operated under a significant conflict of interest, rather than a "minor, technical conflict" that might more readily merit finding an abuse of discretion. *Abatie,* 458 F.3d at 968.

Sun Life was both the plan administrator and the funding source for the AD & D benefits at issue here. Unlike some claims where only a few thousand dollars might be at stake, this case involves an all-or-nothing benefits claim of $500,000. Sun Life argues that despite this structural conflict of interest, its decision must be reviewed only for an abuse of discretion unless plaintiff comes forward with material, probative evidence tending to show that the conflict resulted in a breach of its fiduciary duties, citing *Carder–Cowin v. UNUM Life Ins. Co. of Am.,* 560 F.Supp.2d 1006, 1020 (W.D.Wash.2008). However, *Abatie* directs that an inherent

---

7. Assuming that the record is devoid of evidence which might materially affect the abuse of discretion standard of review, the court dispenses with the usual tests of summary judgment: "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 943 (9th Cir.1999).

financial conflict, such as is present here, must be considered in weighing how much or how little to credit the plan administrator's reason for denying insurance coverage: "[A]buse of discretion review . . . [must be] informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record. This standard applies to the kind of inherent conflict that exists when the plan administrator both administers the plan and funds it, as well as other forms of conflict." *Abatie*, 458 F.3d at 967. Moreover, requiring the plaintiff to come forward with " 'smoking gun' evidence" of a breach of fiduciary duties is contrary to the Ninth Circuit's express rejection of such a requirement because it "wrongly aligns incentives. Instead of being encouraged affirmatively to demonstrate their impartiality and the reasonableness of their decisions, plan administrators are rewarded for suppressing dissent and denying claims with as little explanation as possible." *Id.* (reversing prior Ninth Circuit precedent and "its placement of an unreasonable burden on ERISA plaintiffs").

Plaintiff has presented no "smoking gun" evidence, such as self-dealing, bias, bad faith, irregularities in the claims process, or parsimonious claims-granting history by Sun Life. On the other hand, Sun Life has not followed the Ninth Circuit's suggestion of presenting evidence tending to show that its structural conflict of interest did not affect its decision:

> [A] conflicted administrator, facing closer scrutiny, may find it advisable to bring forth affirmative evidence that any conflict did not influence its decision-

making process, evidence that would be helpful in determining whether or not it has abused its discretion. For example, the administrator might demonstrate that it used truly independent medical examiners or a neutral, independent review process; that its employees do not have incentives to deny claims; that its interpretations of the plan have been consistent among [beneficiaries]; or that it has minimized any potential financial gain through structure of its business (for example through a retroactive payment system).

*Id.* at 969 n. 7.

Sun Life has submitted no evidence of this nature.

This court has carefully reviewed the record of the claims process and the evidence available during that process. That review reveals that Sun Life failed to adequately investigate plaintiff's claim, improperly emphasized evidence favorable to a denial of benefits and de-emphasized evidence favorable to a grant of benefits. As a result, these factors evidence a significant conflict of interest by Sun Life. Viewing Sun Life's decision with a high level of skepticism, this court concludes that Sun Life abused its discretion by concluding that Mr. Lee's death was not accidental and by improperly ignoring the great weight of evidence indicating that the trestle was "open to the public" as contemplated by Oregon law.[8]

## II. *Failure to Adequately Investigate*

One point of contention between the parties is whether Sun Life failed to adequate-

---

**8.** The parties devote considerable effort to analyzing whether the criminal act exclusion is ambiguous. Plaintiff contends that it is ambiguous based on the "common understanding" of the word "crime." Sun Life disagrees, relying on a technical reading of Oregon's criminal statutes. However, this court need not and will not enter this quagmire. As explained in more detail below, even assuming that the criminal act exclusion unambiguously includes misdemeanors such as criminal trespass, the record reveals that Sun Life abused its discretion in applying the criminal act exclusion in this case.

ly investigate plaintiff's claim. Plaintiff contends that Sun Life's investigation was woefully inadequate regarding whether the trestle was "open to the public" and that Sun Life improperly ignored substantial evidence bearing on that issue.

The claims record is telling in that it lacks any information other than compiled in police reports and by plaintiff's attorney. Following plaintiff's August 10, 2007 letter appeal, Sun Life extended its review of the claim during in the following months, stating that it was "analyzing the implied consent issue . . . and the additional documents you sent to us." Ex. B, p. 53. However, nothing in the record indicates that, other than ordering a copy of the police report and reviewing the materials submitted by plaintiff's attorney, Sun Life conducted any independent investigation of the circumstances surrounding Mr. Lee's death or followed up with the individuals identified in the materials submitted by plaintiff.

In particular, Sun Life never sought nor obtained: (1) any evidence concerning the reasoning behind the design of the trestle, including its pedestrian-friendly features such as a walkway, handrails, and a safety island; (2) any actuarial analysis regarding whether it was highly likely that crossing the trestle would result in serious injury or death; (3) any evidence regarding when the "No Trespassing" sign(s) were installed and the reasoning behind their design and placement; (4) any further evidence concerning the number of pedestrians who cross the trestle on a daily basis; (5) any evidence that the police had ever cited or prosecuted pedestrians with criminal trespass as a result of walking on or across the trestle; and (6) any statement from representative(s) of the railroad companies

whose name(s) are on the "No Trespassing" sign(s). As discussed below, absent such evidence, the record overwhelmingly supports the longstanding, open, and obvious use of the trestle for pedestrian travel.

### III. *"Accidental Bodily Injury"*

Plaintiff argues that the record demonstrates that the first reason given by Sun Life as a basis for denying her claim is entirely without support. That reason was that "the injuries resulting in Mr. Lee's death were reasonably foreseeable and were the natural and probable result of conduct knowingly undertaken and therefore, were not due to accidental means." [9] Sun Life offered no further explanation in its denial letters. However, this reason appears to be an effort to exclude Mr. Lee's death as having resulted from an "Accidental Bodily Injury" as defined in the AD & D Plan:

> **Accidental Bodily Injury** means bodily harm caused solely by external, violent and accidental means which is sustained directly and independently of all other causes.

Ex. A, p. 7.

A death or injury "may be deemed accidental under a group accidental insurance policy established under ERISA if the death or injury was unexpected or unintentional." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1126 (9th Cir.2002) (internal quotations, alterations, and citation omitted). An "overlapping subjective and objective inquiry" applies:

> In determining whether death, or the injury that caused the death, was unexpected or unintentional, courts have undertaken an overlapping subjective and objective inquiry. The court first asks

---

**9.** Plaintiff also argued that Sun Life originally gave two reasons for denying her claim, but later retracted one of those reasons after she retained an attorney. However, both the March 29 and December 3, 2007 denial letters give two reasons for the denial. Ex. B, pp. 2, 106.

whether the insured subjectively lacked an expectation of death or injury. If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

*Id.* (internal citations omitted).

Sun Life's denial letters do not explain how Mr. Lee's injuries were "reasonably foreseeable" and the "natural and probable result of conduct knowingly undertaken." However, in its briefing on the cross-motions, Sun Life contends that the physical characteristics of the trestle (525 feet long and "very narrow") made it very difficult for anyone on it to avoid being hit by a passing train, such that death was a highly likely result. The difficulty is that this conclusion is supported by no analysis and is contrary to the evidence in the record.

The evidence in the record indicates that Mr. Lee subjectively lacked an expectation of death or injury. He had repeatedly crossed the trestle on foot in the past, apparently without incident. Ex. B, p. 45. Nothing in the record indicates that he deliberately placed himself in harm's way. To the contrary, while some evidence indicates that Mr. Lee was experiencing difficulties in his personal life, his religious beliefs deterred him from considering suicide. *Id.* at 72. Moreover, the only contemporaneous evidence in the record as to Mr. Lee's actions when crossing the trestle are that he was unaware of the passing train that injured him and thought he had suffered a heart attack. *Id.* at 34, 68.

This subjective expectation by Mr. Lee was reasonable given his prior personal experiences, which included multiple walks across the trestle without incident.

Even assuming that Mr. Lee's subjective expectation could not be adequately ascertained, the record does not support the conclusion that a reasonable person with Mr. Lee's background and characteristics would have viewed his injury or death as substantially certain to result from walking across the trestle. As explained in more detail below, prior to Mr. Lee's injury and death, the trestle was a "popular and well used shortcut" between downtown McMinnville and the residential area south of the ravine. *Id.* at 66 (¶ 2). Schoenthal, who lived near the trestle for the decade prior to Mr. Lee's death, estimated that about 40 people walked across the trestle per day. *Id.* at 66 (¶¶ 2–4), 74. Even assuming that Schoenthal's estimate was overstated by 25%, there would nevertheless be over 100,000 pedestrian/bicyclist crossings of the trestle in the decade prior to Mr. Lee's death. There is no evidence that any of those pedestrians or bicyclists were injured—let alone killed—as a result of such crossings. Absent evidence of any injury, deaths, or even any close calls between pedestrians or bicyclists and passing trains, the record does not support the conclusion that a reasonable person would view injury or death as substantially certain to occur as a result of walking across the trestle.

In short, Sun Life's conclusion that Mr. Lee's death was not due to "accidental means" ignores and is contrary to the only relevant evidence in the record.

### IV. *The Criminal Act Exclusion: "Open to the Public"*

Plaintiff also argues that Sun Life ignored evidence that she submitted showing that the train trestle was "open to the

public," such that Mr. Lee did not commit "trespass" under Oregon law.

Sun Life found that Mr. Lee's death resulted from his act of trespassing on a railroad trestle. That statute relied on by Sun Life requires that the individual "enters or remains unlawfully upon railroad yards, tracks, bridges or rights of way." ORS 164.255(1)(c). Proof that the premises allegedly trespassed upon were "open to the public" is a defense to such a criminal trespass charge. ORS 164.205(3). Under Oregon law, premises are considered "open to the public" when "their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required." ORS 164.205(4). As explained above, Sun Life offered four reasons for its conclusion that the trestle was not "open to the public." This court considers each in turn.

### A. *The Presence of a "No Trespassing" Sign*

In support of its conclusion that a reasonable person would believe that permission was required to walk across the trestle, Sun Life relied heavily on the existence of "No Trespassing" signs which it contends were posted on either end of the trestle. However, the presence of such signs is not dispositive, but rather is one factor among several relevant to the "open to the public" inquiry, with the ultimate issue being whether or not a reasonable person would conclude that no permission to enter was required. ORS 164.205(4).

Sun Life insists that "No Trespassing" signs were on both ends of the trestle, but has pointed to no evidence confirming that both signs were there on the date of Mr. Lee's death. Plaintiff counters Sun Life's position by pointing to Schoenthal's sworn statement that no such sign was in place on the north end of the trestle. Ex. B, p. 67 (¶ 4). Although the record contains photographs of a sign on the north end, nothing in the record indicates when those photographs were taken. It also is noteworthy that the photographs of the sign on the north end reveal a brand new sign with a different railroad name than the sign on the south end. *Id.* at 4–7. From this evidence, it can reasonably be inferred that the sign on the north end of the trestle was erected after Mr. Lee's death.

In addition, the sign on the south end of the trestle was obscured by graffiti to the point it was difficult to read. *Id.* at 6–7, 67 (¶ 4). Sun Life provides no basis for its conclusion that it was "reasonable to assume that [Mr. Lee] must have noticed the 'No Trespassing' signs on this and prior trips across the trestle." *Id.* at 2. Even had Mr. Lee "noticed" the signs, their positioning and the lack of maintenance indicate a lack of intent to enforce them against pedestrians. If the intent of the sign(s) was to clearly indicate that pedestrian or bicycle traffic was prohibited, the location of the sign(s) did not accomplish that purpose. They are not posted at eye-level for pedestrians. In addition, the sign on the north side of the trestle (if it in fact was there at the time of the accident) is off to the side of the tracks, away from the walkway and fence-like structure which runs the length of the trestle.

### B. *Physical Nature and Function of the Trestle*

Sun Life also concluded the train trestle was 30 feet above the ground, 525 feet long, and narrow, making it ill-suited for pedestrian travel, and that the physical nature and function of the trestle was "to permit the rapid travel of large heavy trains, not pedestrians." Ex. B, p. 2, 136. However, the record reveals several physical features of the trestle that form a

pedestrian-ambiguous—if not pedestrian-friendly—design.

First, the trestle not only consisted of tracks and ties mounted on a supporting structure, but also included strips of metal grating several feet wide between the ties and extending out on either side of the two train tracks. *Id.* at 49–50. Those metal strips provide a walkway allowing pedestrian traffic to easily cross the ravine on the trestle outside the tracks. *Id.* at 49–50, 68, 71, 73. Along the sides of that walkway, the trestle includes a fence-like structure, consisting of three horizontal evenly-spaced cables strung between vertical posts spaced a few feet apart, which act as "handrails." *Id.* at 49–50, 132, 136. The record reveals no purpose for the walkways or handrails other than to support pedestrian traffic. Additionally, the police report indicates that a "safety island" exists near the mid-point of the trestle (249 feet from the location on the south end of trestle where handrails end). *Id.* at 136. Again, the record reveals no purpose for such a "safety island" other than to provide an additional safety measure for pedestrians. To the contrary, none of these pedestrian-friendly features is necessary to permit the rapid travel of large heavy trains. Instead, a walkway, handrail, and safety island are clearly directed at increasing the safety of pedestrians, not improving the passage of trains.

## C. *Repeated Pedestrian Use and Lack of Enforcement*

Next, as evidence that the trestle was not "open to the public," Sun Life cites Martinez's concern that the police would issue him a citation for trespassing. While Martinez did express this concern when called in for questioning by the police, he apparently was never issued any citation for his conduct of walking across the trestle. The great weight of evidence in the record indicates that the trestle was regularly used by pedestrians in the decade

prior to Mr. Lee's death, but that restrictions on pedestrian access prior to that time were virtually nonexistent.

Despite an available alternative pedestrian crossing (in the form of the "Ford Street dip," a public street which goes into and then back up and out of the ravine; *id.* at 68, 70–71, 73) and at least until the time of Mr. Lee's unfortunate demise, the train trestle was regularly used by pedestrians, including Mr. Lee, as a means of crossing the ravine—a fact borne out by Martinez's presence as a pedestrian on the trestle shortly after the train ran over Mr. Lee. A well-worn path between the portion of the tracks just south of the trestle and the roadway at the bottom of the embankment supporting the tracks is clearly visible. *Id.* at 51–52. According to anecdotal evidence in newspaper articles shortly after the accident, the trestle was "a popular [shortcut] with locals" which generated about 40 pedestrian crossings per day. *Id.* at 68, 74 (quoting Police Lt. Buz Sawyer: "The railroad tracks are commonly used as a shortcut between the south end of the city and downtown.").

Although Police Lt. Sawyer indicated that individuals crossing the trestle on foot or bicycle "can be prosecuted for first-degree trespassing" (*id.* at 74), there is no evidence that anyone ever was in fact prosecuted prior to (or even after) Mr. Lee's death. To the contrary, Schoenthal, who lives very close to the train trestle, saw "minimal if any effort to enforce any restriction on access to the trestle by pedestrians using it to cross the Ford Street dip" during the decade prior to Mr. Lee's death, and noted that it was not until after Mr. Lee's death "that even token enforcement of restrictions on access to that property have been enforced by McMinnville police." *Id.* at 66, (¶¶ 2–4).

#### D. *Evidence of Consent by the Railroad*

As its final reason for denying plaintiff's claim, Sun Life cited the lack of evidence that the railroad that owns the trestle consented to Mr. Lee's trespass. Not only did Sun Life fail to ascertain the railroad's position concerning trespassers, its reasoning also conflates the issue of consent by the owner with the issue of "open to the public." As noted above, premises are considered "open to the public" when "their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required." ORS 164.205(4). The focus is on the belief of a reasonable person as to whether permission to enter is required. The entrant may also be "otherwise licensed or privileged" to enter. ORS 164.205(3)(a).

#### E. *Conclusion*

In sum, the circumstances at the time Mr. Lee traversed the trestle included: (1) a decade-long history of regular and continuing pedestrian traffic on the trestle; (2) a failure to design the "No Trespassing" sign(s) to clearly convey an intent to preclude pedestrian traffic and to maintain them in a readable state; (3) a complete lack of any enforcement of the trespass statutes against individuals traversing the trestle on foot or bicycle despite the knowledge by local police officials and others in the community of the continuous use of the trestle by pedestrians; and (4) several physical features encouraging pedestrian use of the trestle. These circumstances point to but one conclusion, namely that when Mr. Lee last walked across the trestle, no reasonable person would have believed that permission to traverse the trestle on foot was required.

Accordingly, this court concludes that Sun Life abused its discretion in applying the "criminal act" exclusion to preclude the payment of benefits in this case.

### RECOMMENDATIONS

Defendant's Motion for Summary Judgment (docket # 19) should be DENIED; Plaintiff's Cross–Motion for Summary Judgment (docket # 25) should be GRANTED; and judgment should be entered in favor of plaintiff.

### SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due June 26, 2009. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 9th day of June, 2009.